UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
KAREEM ADAMS,

Plaintiff,

-against-

GOLD & ROSENBLATT LLC,
GOLD & ROSENBLATT P.C.
RANDI ROSENBLATT,
CHRISTINE PANZA,
ANDREWS 102 LLC, and
RESIDENTIAL MANAGEMENT (NY), INC.
Defendants.
----------------------------------------------------------x

Civil Action No. 1:26-cv-2419-ER

**FIRST-AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Kareem Adams, by his attorneys, The Law Office of Ahmad Keshavarz and The Legal Aid Society, brings his complaint against Defendants Gold & Rosenblatt, LLC, a debt collection law firm, and Randi Rosenblatt, Esq., and Christine Panza, Esq., two attorneys at the firm, and Gold & Rosenblatt P.C. (collectively "Attorney Defendants") for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* and New York Judiciary Law § 487; against Andrews 102 LLC ("Andrews"), a landlord, and its property management company, Residential Management (NY), Inc. ("Residential") (collectively "Landlord Defendants"), as well as the Attorney Defendants for violating GBL § 349 and committing gross negligence, and alleges as follows:

## SUMMARY OF CLAIMS[1]

Kareem Adams is a working-class parent raising his three young daughters in a small rent-stabilized apartment where he has lived for twenty years. He has been hounded for years for

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

rent he does not owe. The Attorney Defendants, on behalf of the Landlord Defendants, have filed ***eight*** lawsuits in ***five*** years seeking to evict Mr. Adams and his family for non-payment of rent when in fact Mr. Adams owed nothing. Each time the Attorney Defendants would sue, Mr. Adams, panicked his family would be evicted, would take time off from work and pay travel expenses to promptly go to the court clerk with proof of payment of his rent. The Attorney Defendants would, in each case, eventually file a discontinuance vaguely admitting that Mr. Adams had satisfied the amount sought in the petition. In fact, Mr. Adams did not satisfy the amounts sought in the petitions: he never owed them. The discontinuances would then gratuitously allege Mr. Adams owed thousands of dollars of rent from the months following the date of pre-suit rent demand letter through the date of discontinuance when, in fact, none of those months were owed. Mr. Adams paid rent for those months with money orders specifically earmarked for each month, which is his ordinary practice for all rent payments.

Either after the discontinuance – or sometimes while a suit was still pending – the Attorney Defendants would file another non-payment action for additional months, none of which were owed. When Attorney Defendants maintained multiple suits at the same time, their own petitions sought overlapping months of rent, seeking a double judgment for those months.

At the same time, the Landlord Defendants would send Mr. Adams monthly statements demanding that month's rent – which Mr. Adams would promptly pay -- but also alleging thousands of dollars in rental arrears, security arrears, and legal fees, none of which he owed. The Landlord Defendants (or perhaps the Attorney Defendants on behalf of the Landlord Defendants) would send 14-day pre-suit demand letters for months of rent that were already paid..

To be clear, even this federal case does not deter Defendants from their collection

misconduct. The eighth lawsuit was filed on March 19, 2026, just four days before the filing of the Original Complaint in this action. Even after learning of the instant action, being served on April 29, 2026 and noticing an appearance on May, 10, 2026 [Dkt. No. 11], Defendants doggedly pursued the eighth lawsuit until, on August 5, 2026, the state court judge granted Mr. Adams motion to dismiss, holding that the rent sought had already been satisfied. And in the latest development, less than two weeks after the state court dismissed the eighth lawsuit and just over a month after defendants filed a motion to dismiss in the instant action [Dkt. No. 16], the Landlord Defendants (or perhaps Attorney Defendants on behalf of the Landlord Defendants) sent yet another 14-day pre-suit demand letter to Mr. Adams on or about August 21, 2026, threatening what would be a ***ninth*** lawsuit. On August 20, 2026 the Attorney Defendants (oddly under the name of a P.C. rather than an LLC) sent a rent demand letter expressly on the firm letterhead.

The purpose behind these eight suits and multiple demand letters is, for the Landlord Defendants, to pressure rent-stabilized tenants to pay money not owed under threat of eviction. The benefit for the Attorney Defendants is even clearer: they get paid per suit filed. They are glad to file discontinuance and file a suit again.

By signing, filing, and serving the non-payment petitions the Attorney Defendants, on behalf of the Landlord Defendants, have been repeatedly representing to Mr. Adams that there was meaningful attorney involvement leading to their legal conclusion that Mr. Adams owed certain months of rent when in fact that was not true. Indeed, the ledgers Attorney Defendants attached to their discontinuances acknowledging that the petition had been satisfied show that Mr. Adams had already, prior to their filing of the non-payment petition, paid the months for which they had sued. Either Attorney Defendants did not request or did not review the rent

ledger, and were blindly filing and serving petitions, or, even worse, Attorney Defendants did review the ledgers and filed suit anyway. Even for the amounts the Attorney Defendants assert in their discontinuance as being still owed are shown as actually being paid in each ledger they themselves attach to each discontinuance. That demonstrates a lack of meaningful attorney review – or any review at all. Not only is the conduct of the Attorney Defendants deceptive, it is fundamentally unfair and unconscionable to repeatedly suit Mr. Adams for rent he does not owe. A review of landlord-tenant filings in NYSCEF demonstrates a pattern and practice of the Attorney Defendants, for the Landlord Defendants, engaging in the same misconduct as to other tenants as they engaged in against Mr. Adams.

These facts and others support claims for violations of the FDCPA and Judiciary Law § 487 against the Attorney Defendants, and gross negligence and claims for violations of GBL § 349 against all Defendants.

Making rent demands not owed,[2] and making demands for thousands of dollars of rental arrears and attorney's fees, was a way for the Landlord Defendants to pressure Mr. Adams to pay more than he actually owed in order to prevent from having his family and himself evicted. If he appeared to defend the case, Defendants would simply discontinue and file again. And for the Attorney Defendants the purpose was even clearer: they were paid for each non-payment petition they filed. Filing, discontinuing, and refiling is a money-making machine requiring almost no attorney time, and certainly no meaningful attorney involvement.

Mr. Adams was forced to navigate the court system *pro se* for six cases. Even when he was represented by the Legal Aid Society in the seventh and eighth cases, the Attorney Defendants doubled and tripled down, continuing to litigate the case even after the legal services

[2] *See* **Exhibit** Q (May 1, 2025 payment stub by Landlord Defendants falsely alleging rental arrears and legal arrears).

attorney provided them documentary proof that the rent being sought was already paid.

Defendants have inflicted substantial emotional distress damages upon Mr. Adams. For years now he has lived in constant dread that the Attorney Defendants will sue him yet again for rent he does not owe. When he gets his monthly billing statements from the Landlord Defendants, which say he owes thoughts of dollars of rental arrears and attorney's fees when he does not, that dread overwhelms him again and again, until yet again the Attorney Defendants sue for rent not owed. He cannot sleep for weeks at a time each time Defendants again hound him for rent he does not owe. He tosses and turns, with thoughts running through his head of the prospect of eviction—not just for himself, but more importantly for his three young daughters. Where could they afford to live? He has been rent-stabilized for twenty years; how could he afford the current market rents for a home for him and his daughters? Will his daughters be uprooted from their schools and their friends, in his search for affordable housing? The lack of sleep especially affects him because he works long hours, getting up at 4:00 AM or 4:30 AM and working through the late afternoon, and sometimes even into the evening. Mr. Adams feels overwhelmed, like his fate is out of his control, and as if he is at the mercy of his landlord and their attorneys. He has also had to take time off from work to repeatedly go to the courthouse and to pay transportation costs there and back.

Mr. Adams now files suit to hold Defendants liable for their misconduct.

## <u>JURISDICTION AND VENUE</u>

1. This Court has jurisdiction pursuant to the FDCPA, 15 U.S.C. § 1692k(d), and under 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative fact with the federal claim and

are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

3. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within the Southern District of New York.

**PARTIES**

4. Plaintiff Mr. Kareem Adams is a natural person residing at 102 West 183rd St, Apt. 2A, Bronx, NY 10453.

5. Defendant Gold & Rosenblatt, LLC ("Gold & Rosenblatt" or "the Firm") is a debt collection law firm organized under the laws of the State of New York with a principal place of business at 840 Grand Concourse, Bronx, NY 10451. Gold & Rosenblatt engages in business in New York State and this suit arises out of Gold & Rosenblatt's business in New York State.

6. Defendant Randi Rosenblatt is an attorney licensed to practice law in New York State since 1979. She is a principal Gold & Rosenblatt, LLC, a small landlord tenant law firm representing landlords. On information and belief, she manages and controls the landlord tenant practices, including as to the Landlord Defendants. Ms. Rosenblatt has been personally involved in cases against Mr. Adams, signing the four of the eight wrongful Petitions, including the two most recent.

7. Defendant Christine Panza is an attorney at Gold & Rosenblatt, LLC. She has been admitted to practice law in New York State since 2003.[3] Ms. Panza has been personally involved in each of the eight cases against Mr. Adams, signing five of the eight wrongful

[3] Ms. Panza's involvement in the wrongful landlord-tenant actions towards Mr. Adams was interrupted by an 11-month bar suspension unrelated to the matters raised in this case beginning November 2022.

Petitions and signing all eight of the discontinuances, with their false representations that additional months of rent were still owed. She also appeared and litigated the seventh and eighth lawsuit.

8. According to NYSCEF, the New York State Courts Electronic Filing system, Ms. Panza has filed over 700 landlord tenant non-payment petitions in just the nine months since June 16, 2025.

9. As attorney at Gold & Rosenblatt, Ms. Panza and Ms. Rosenblatt regularly attempt to seek rent from residential tenants. On behalf of the firm they have executed and filed hundreds of non-payment petitions or related court filings in those cases in the landlord tenant court in just the last year according to NYSCEF, the New York State Courts Electronic Filing system. As such, Gold & Rosenblatt, Ms. Panza and Ms. Rosenblatt are debt collectors as defined by the FDCPA.

10. The Attorney Defendants were acting as the agents of the Landlord Defendants in their litigation and other attempts to collect the putative debts. Attorney Defendants were acting within the course and scope of their agency. Attorney Defendants were the freely chosen counsel of the Landlord Defendants. Therefore, the Landlord Defendants are jointly and severally liable for the conduct of the Attorney Defendants.

11. Defendant Gold & Rosenblatt P.C. is the entity that, according to the letterhead, sent an August 20, 2026 debt collection letter to Mr. Adams as set forth below. Defendant Gold & Rosenblatt P.C.'s business address, as provided in the August 20, 2026 letter, is 840 Grand Concourse, Bronx, NY 10451, the same address as Defendant Gold & Rosenblatt LLC's. Gold & Rosenblatt P.C. does not appear to be listed in New York Department of State, Division of Corporations website. It is unclear whether this entity actually exists, or whether this is the same

entity as Defendant Gold & Rosenblatt LLC. Out of an abundance of caution, Plaintiff names Gold & Rosenblatt P.C. as a defendant herein.

12. Defendant Andrews 102 LLC ("Andrews") is a domestic limited liability corporation organized under the law of the State of New York. It is the owner of a portfolio of properties, including the building where Mr. Adams resides, 102 West 183rd St., Bronx, NY, and was the petitioner on each of the eight rental arrears lawsuits filed against Mr. Adams.

13. Defendant Residential Management (NY), Inc. ("Residential") is a domestic limited liability corporation organized under the law of the State of New York with its headquarters and its principal place of business in 1651 Coney Island Avenue, 4th Floor, Brooklyn, NY 11230.

14. Residential was at all relevant times the property management company responsible for the day-to-day operations of Andrews at the 102 West 183rd Street building, including but not limited to sending rent invoices to tenants like Mr. Adams. While Andrews is the owner of the property and the plaintiff in the rental arrears suit, on information and belief many if not all of the relevant actions of Andrews are done by Residential. For example, each of the eight rental arrears lawsuits by Attorney Defendants on behalf of Andrews against Mr. Adams lists a managing agent at Residential's Coney Island Avenue address. The address for Andrews listed on the New York Secretary of State's website and on each rent demand and each non-payment Petition is the Coney Island Avenue address of Residential. Mr. Adams's payments are made each month by money order to Residential. Monthly billing statements come from Residential. The monthly statements suggest Mr. Adams make rent payments through a Residential on-line payment portal. The lease renewal forms list Residential Management (NY), Inc, as the "owner/agent." The COVID-19 Declaration of Hardship form attached to the Petition

in LT-305168-22/BX directed the tenant to complete the form and either email it to a Residential email address (Cheryl@resimgt.com) or mail it to Andrews at the Residential office address on Coney Island Avenue.

15. As such, Residential is jointly and severally liable for the acts of Andrews.

## STATEMENT OF FACTS

### *Mr. Adams's Rent-Stabilized Tenancy and the Defendants' Barrage of Baseless Nonpayment Eviction Suits*

16. Kareem Adams is a working-class parent raising his three young daughters in a small rent-stabilized apartment where he has lived for twenty years. He works long hours as a chef, getting up at 4:00 AM or 4:30 AM each day.

17. The building Mr. Adams lives in is managed by Defendant Residential. Residential generates rental invoices to Mr. Adams each month for rent alleged to be owed, and Mr. Adams makes his monthly rent payments to Residential via money orders made out to Residential's name and address.

18. The Attorney Defendants, on behalf of the Landlord Defendants, sued Mr. Adams ***eight*** times in ***five*** years for rent he does not owe, and seeking to evict him and his three young daughters. Mr. Adams went to the courthouse for seven of the cases. Mr. Adams was *pro se* for the first six lawsuits. For two months he was *pro se* in the seventh suit but ultimately was able to obtain representation by the Legal Aid Society in that case. Seven suits were discontinued and the eight dismissed by order of the court because Mr. Adams never owed the money for which he was sued, a fact Defendants seemed to tacitly suggest in their dismissals by noting that the petition had been satisfied. Even in the dismissals in the first six cases, Defendants falsely alleged Mr. Adams owed rent for additional months, while the ledger they attached to the discontinuances document Mr. Adams had actually already paid not only the amounts in the

Petitions, but also the additional months Defendants also alleged were due in their gratuitous language in the discontinuance order. The discontinuances all had certificates of service stating they were mailed to Mr. Adams.

19. After the Court set a hearing in the fourth case, Attorney Defendants discontinued the first, second, and third cases.

20. While only the sixth and eighth lawsuits, and the August 21, 2026 rent demand are within the Fair Debt Collection Practices Act's one-year statute of limitations, those, along with the fourth and fifth lawsuit are within the three-year GBL § 349 and gross negligence statute of limitations and all eight are within the six-year Judiciary Law § 487 statute of limitations. This complaint will address them in chronological order.

**First suit: LT-305095-21/BX**

21. On May 24, 2021, the Firm, on behalf of the Landlord Defendants, filed their first non-payment petition against Mr. Adams seeking eviction and judgment for $9,748.95 in rent calculated as $1,606.76 for each month from December 2020 to May 2021, and $108.39 for November 2020. **Exhibit** A (First Petition, **LT-305095-21/BX**).[4] Defendant Panza signed the petition with a verification that she read the petition and believed information therein were true based on her own personal knowledge or upon the review of the records of the petitioner.

22. The Petition attached a Fourteen Day Notice dated April 15, 2021alleged to have been sent by Landlord Defendants to Mr. Adams. The notice alleged Mr. Adams owed $8,142.19 and if he did not pay that amount or leave the premises within 14 days they would file a non-payment petition and seek eviction. The letter stated the amount $8,142.19 in rent was calculated as $1,606.76 for each month from December 2020 to April 2021, and $108.39 for the month of

[4] All Exhibits in this complaint are incorporated by reference into this complaint in their entirety.

November 2020.

23. Defendants did not attach a ledger to either the non-Payment petition or the Fourteen Day notice.

24. The petition identified the managing agent as a person at the Coney Island Ave. office address of Residential.

25. The COVID-19 Declaration of Hardship form attached to the Petition in LT-305168-22/BX directed the tenant to complete the form and either email it to a Residential email address (Cheryl@resimgt.com) or mail it to Andrews at the Residential office address on Coney Island Avenue.

26. Upon receiving the non-payment petition, Mr. Adams promptly went to the courthouse. He went to the court clerk's window where *pro se* answers are filed and brought the court papers to respond to the lawsuit. Mr. Adams took time off from work and paid for transportation to get to the courthouse.

27. This suit had no further action taken until the delayed action of a discontinuance by Defendant Panza on January 31, 2024, detailed *infra*, being later filed on February 11, 2024. Exhibit B (First Discontinuance).

**Second suit: LT-311826-21/BX**

28. On October 13, 2021, the Firm, on behalf of the Landlord Defendants, filed their second non-payment petition against Mr. Adams seeking eviction and judgment for $9,748.95 in rent calculated as $1,606.76 for each month from May 2021 to October 2021, and $108.39 for April 2021 **Exhibit** C (Second Petition, **LT-311826-21/BX**)

29. Incredibly, Defendants sued Mr. Adams a second time that same year while the first action remained pending, purchasing an index number and filing a second case on October

5, 2021.

30. The Second Petition, signed by Defendant Panza, alleges an identical balance of $9,748.95, but this time for the months April 2021 through October 2021, with $1,606.76 between May 2021 to August 2021, and $108.39 for April 2021. **Exhibit** C (Second Petition, **LT-311826-21/BX**)

31. Similarly to the first suit, The Petition attached a Fourteen Day Notice dated August 30, 2021, which was allegedly sent by Landlord Defendants to Mr. Adams. The notice alleged Mr. Adams owed $6,535.43 and if he did not pay that amount or leave the premises within 14 days, they would file a non-payment petition and seek eviction. The letter stated the amount $6,535.43 in rent was calculated as $1,606.76 for each month from May 2021 to August 2021, and $108.39 for the month of April 2021.

32. Mr. Adams in fact did not owe any rent and had already paid all of the amounts alleged in the Petition and the Fourteen Day Notice with payments earmarked for the months sued for.

33. Defendants did not attach a ledger to either the non-Payment petition of the Fourteen Day notice.

34. The petition identified the managing agent as a person at the Coney Island Ave. office address of Residential.

35. The Second Petition, on its face, sought some of the same rent already sought in the still-pending earlier 2021 action, namely April and May of 2021. It is a well-established principle for any first-year law student that a party may not seek the same recovery twice, but that is exactly what Defendants did here by seeking April and May 2021 rent (which had already been paid) in a second suit while a first suit which also sought rent for those months remained

pending.

36. As they also did in the preceding and following cases, Defendants simply chose to let the case sit idle—leaving each case pending against Mr. Adams until the very belated signing of a discontinuance by Defendant Panza on January 31, 2024. Exhibit D (Second Discontinuance).

On January 31, 2024 the Firm signed the discontinuance and filed it on February 11, 2024.

**Third suit: LT-305168-22/BX**

37. On March 1, 2022 the Firm, on behalf of the Landlord Defendants, filed their third non-payment petition against Mr. Adams with both the first and second lawsuits pending.

38. The Third Petition, signed by Defendant Panza, alleges an identical balance of $9,748.95 from the first and second suit, but this time for the months August 2021 through February 2022. **Exhibit** E (Third Petition, **LT-305168-22/BX**). The alleged rent was calculated as $1,606.76 for each month from September 2021 to February 2022, and $108.39 for the month of August 2021.

39. The Third Petition, on its face, sought some of the same rent already sought in the still-pending second 2021 action, namely August through October of 2021. Defendants—again—were seeking rent (which had already been paid) in a later suit while an earlier suit also seeking rent for those months remained pending.

40. Similarly to the first suit, the Petition attached a Fourteen Day Notice dated January 14, 2022, which was allegedly sent by Landlord Defendants to Mr. Adams. The notice alleged Mr. Adams owed $8,142.19 and if he did not pay that amount or leave the premises within 14 days, they would file a non-payment petition and seek eviction. The letter stated the

amount $8,142.19 in rent was calculated as $1,606.76 for each month from September 2021 to January 2022, and $108.39 for the month of August 2021.

41. Mr. Adams in fact did not owe any rent and had already paid all of the amounts alleged in the Petition and the Fourteen Day Notice with payments earmarked for the months sued for.

42. Defendants did not attach a ledger to either the non-Payment petition of the Fourteen Day notice.

43. The petition identified the managing agent as a person at the Coney Island Ave. office address of Residential.

44. Additionally, New York law requires that all payments alleged to be due on a lease must be sought in one action. After the filing of the First Petition and so long as the First Petition remained pending, Defendants' only lawful route to seek additional months was via amendment of the First Petition, not through filing of additional petitions. As discussed above, this is impermissible claim-splitting, clearly prohibited by decades of binding precedent in New York's landlord-tenant courts.

45. On January 31, 2024, the Firm signed the discontinuance and filed it on February 11, 2024. Exhibit F (Third Discontinuance).

**The ledger Attorney Defendants attached to their Discontinuances in the First, Second, and Third Cases demonstrates that Defendants knew (or should have known) when they filed that none of money alleged was owed**

46. For the First, Second, and Third Petitions—filed on May 24, 2021, October 13, 2021, March 1, 2022, respectively—all three cases sat for two to three years until Panza executed Discontinuances for all three cases dated January 31, 2024, and filed them all on February 11,

2024.[5]

47. All three of the Discontinuances attached a ledger (apparently) printed on January 18, 2024 showing dates of rent payments and amounts alleged to be due.

48. The ledger, dated January 18, 2024, was made a year after it was supposedly mailed to Mr. Adams and three weeks prior to the discontinuance being filed.

49. The ledger demonstrates that according to Defendants very own records, they knew (or should have known) on the date of the filing of the First, Second, and Third Petitions that Mr. Adams did not owe the amounts.

50. For instance, for the following months identified in the first, second, and third suits – December 2020; March 2021 through December 2021; and January 2022 through February 2022 – according to the rent ledger provided in the discontinuation, each of these month's rent payments were not only recorded, but they were marked as received within the month they became due. There are only three months within all of these suits where rent is allegedly missing, yet Mr. Adams has money order receipts to prove that the rent was paid. These receipts were shared with Defendant Residential when Mr. Adams visited the Coney Island address in the sixth suit in order to correct the rent ledger, discussed *infra*.

51. Regardless, the Firm started all three cases when there was ample proof that the rent was already paid and being received within the months they are alleging were unpaid.

52. Further, on each of the Discontinuances, the following language was inserted: "Petitioner alleges $5,222.11 is due through January 31, 2024, comprised of October 2023 at $170.53 and November 2023 through January 2024 at $1,683.86 per month." Exhibits B, D, F_(First, Second, and Third Discontinuances).

[5] The Discontinuance had a certificate of service, signed under penalty of perjury by Defendant Panza, of January 31, 2023 despite the date of the signature is a year later, January 31, ***2024***. Presumably this is just a typographical error and not material.

53. In fact, according to the rent ledger attached to the Discontinuation, October 2023 rent was paid in full with two separate payments on October 16, 2023, and November rent was paid in full with two separate payments on November 15, 2023.

54. According to the money order receipts provided by Mr. Adams, December 2023 rent was paid in full on December 23, 2023 in two separate payments, and January 2024 was paid in full on January 22, 2024 in two separate payments.

55. Defendant Panza alleged in three different Discontinuances that Mr. Adams owed rent that he did not owe. Mr. Adams did not owe October-November 2023 rent, with the proof being in the Discontinuance, and yet the language was carelessly included to assert Mr. Adams owed $5,222.11 of rent.

56. Further, it could be argued that there may have been a delay in recording the December 2023 rent payments and the rent ledger would not have the January payment recorded, because the rent ledger was dated January 18, 2024. However, the Discontinuance is dated January 31, 2024. Instead of working with an up-to-date ledger, Defendant Panza wrote this Discontinuance, making allegations of rent owed, without an outdated ledger. Then, Defendant Panza filed the Discontinuance a little over a month later, on February 11, 2024, with no corrections.

57. As discussed, on February 11, 2024, Panza filed a Discontinuance dated January 31, 2024. Yet, on the same Discontinuance, Panza claims to have executed, one year earlier, under a certificate of service, that she personally mailed the Discontinuance to Mr. Adams on January 31, 2023.

58. By signing, filing, and serving the non-payment petitions the Attorney Defendants, on behalf of the Landlord Defendants, the Attorney Defendants are representing to

Mr. Adams that there was meaningful attorney involvement leading to their legal conclusion that Mr. Adams owed certain months of rent when in fact that was not true. Indeed, the ledgers Attorney Defendants attached to their discontinuances acknowledging that the petition had been satisfied show that Mr. Adams had already, prior to their filing of the non-payment petition, the months for which they had sued. Either Attorney Defendants did not request or did not review the rent ledger and were blindly filing and serving petitions, or Attorney Defendants did review the ledgers and filed suit anyway. Even for the amounts the Attorney Defendants assert in their discontinuance is still owed is shown as actually being paid in the ledger they themselves attach to the discontinuance. That demonstrates a lack of meaningful attorney review – or any review at all. Not only is the conduct of the Attorney Defendants deceptive, it is fundamentally unfair and unconscionable to repeatedly suit Mr. Adams for rent he does not owe. A review of the landlord tenant filing in NYSCEF demonstrate a pattern and practice of the Attorney Defendants, for the Landlord Defendants, engaging in the same misconduct as to other tenants as they engaged in against Mr. Adams.

**Fourth suit: LT-309504-24/BX**

59. While Defendants would not initiate a new suit in 2023, they would sue Mr. Adams twice in both 2024 and 2025, filing the first of four more rapid-fire suits in March 2024, just over a month after the belated discontinuance of all three of the prior suits.

60. On March 10, 2024, the Firm, on behalf of the Landlord Defendants, filed their second non-payment petition against Mr. Adams seeking eviction and judgment for $5,222.11 in rent calculated as $1,683.86 for the months November 2023 to January 2024, and $170.53 for October 2023. **Exhibit** G (Fourth Petition, **LT-309504-24/BX**)

61. The Petition attached a Fourteen Day Notice dated February 1, 2024, which was

allegedly sent by Landlord Defendants to Mr. Adams. The notice alleged Mr. Adams owed $5,222.11 and if he did not pay that amount or leave the premises within 14 days, they would file a non-payment petition and seek eviction. The letter stated the amount $5,222.11 in rent was calculated as $1,683.86 for each month from November 2023 to January 2024, and $170.53 for the month of October 2023.

62. Mr. Adams in fact did not owe any rent and had already paid all of the amounts alleged in the Petition and the Fourteen Day Notice with payments earmarked for the months sued for.

63. Defendants did not attach a ledger to either the non-Payment petition of the Fourteen Day notice.

64. The petition identified the managing agent as a person at the Coney Island Ave. office address of Residential.

65. On October 9, 2024, Defendant Panza from the Firm filed a Notice of Discontinuance as the petition was satisfied. However, without the Petition being amended, Defendant Panza included the following language: “Petitioner alleges $5,189.60 is owed through August 31, 2024, comprised of $1,296.80 for May 2024, and $1,297.60 per month for June 2024 through August 2024." Exhibit H (Fourth Discontinuance).

66. However, according to the rent ledger attached to the Discontinuance, each of these months, June 2024 through August 2024, was fully paid and received within the months they became due in the form of two separate payments. June was paid on June 20, 2024, July was paid on July 25, 2024, and August was paid on August 22, 2024. No rent was due for any of these months, but Defendant Panza accused Mr. Adams of owing $5,189.60 from these months despite the rent ledger saying otherwise.

**Fifth suit: LT-335961-24/BX**

67. Defendants came back for another bite at the apple with the Fifth Petition on October 10, 2024.

68. The Fifth Petition, signed by Defendant Panza, seeks $1,851.92 for the months of July 2024 for $168.06 and August 2024 for $1,683.86. Exhibit I (Fifth Petition).

69. Similar to previous cases, the Petition attached a Fourteen Day Notice dated September 10, 2024, which was allegedly sent by Landlord Defendants to Mr. Adams. The notice did not include a rent ledger but alleged Mr. Adams owed $3,535.78 and if he did not pay that amount or leave the premises within 14 days, they would file a non-payment petition and seek eviction. The letter stated the amount $3,535.78 in rent was calculated as $1,683.86 for each month from July 2024 to August 2024, and $168.06 for the month of June 2024.

70. Again, Mr. Adams did not owe any rent and had already paid all of the amounts alleged in the Petition and the Fourteen Day Notice with payments earmarked for the months sued for.

71. On October 28, 2024 Mr. Adams goes to information window at Bronx Landlord Court where tenants file *pro se* answers. The clerk then filed a *pro se* answer on behalf of Mr. Adams but without his knowledge. Mr. Adams explained to this clerk that he has paid all of his rent and that no rent is owed.

72. On October 28, 2024 the court clerk sets a virtual court conference for January 14, 2025 and served notice on the parties.

73. At the January 14, 2024 Court hearing the court dismissed the Fifth Lawsuit.

74. On January 17, 2025, three days after the case was dismissed by the Firm filed a Discontinuance, with a signature date apparently back dated to January 13, 2025, the day before the case was dismissed by the Court.

75. In this backdated Discontinuance Defendant Panza includes the following language: "Petitioner alleges $5,219.64, is due through January 31, 2025, comprised of October 2024 at $168.06, and November 2024 through January 2025 at $1,683.86 per month." Exhibit J (Fifth Discontinuance).

76. According to the rent ledger attached to the Discontinuance, October rent was paid and recorded on October 24, 2024, November rent was paid and recorded on November 29, 2024, and December rent was paid and recorded on December 19, 2024. Defendant Panza was again alleging rent owed for months already paid for all while attaching the proof, the rent ledger, that shows this information. In the Discontinuance, Defendant Panza continued to accuse Mr. Adams of owing rent instead of simply reviewing the rent ledger.

77. The Discontinuance was stamped approved by the court on May 22, 2025.

**Sixth suit: LT-310503-25/BX**

78. On March 28, 2025, the Firm, on behalf of the Landlord Defendants, filed another non-payment petition against Mr. Adams seeking eviction and judgment for $1,851.92 in rent calculated as $168.06 for January 2025 and $1,683.86 for February 2025. **Exhibit** K (Sixth Petition, **LT-310503-25/BX**)

79. On March 28, 2025, Defendants filed their sixth non-payment petition, LT-310503-25/BX, this time seeking $1,851.92, consisting of $1,683.86 for February 2025 and, $168.06 for March 2024.

80. The Rent Demand dated February 18, 2025 was allegedly sent to Mr. Adams and is attached to the Sixth Petition, listing $5,219.64 as allegedly owed, this time for the months of December 2024 through February 2025 for $1,683.86 each month and $168.06 for November 2024.

81. Mr. Adams, however, had already paid all of the amounts alleged in the Petition and the Rent Demand with payments earmarked for the months sued for.

82. In response to the Sixth Petition, Mr. Adams traveled to the Residential office on Ocean Avenue with his money order receipts, in the hopes of correcting the rent ledger with management directly.

83. Mr. Adams took off time from work and paid travel expenses to go to have the Landlord Defendants dismiss the case as he showed Residential proof of payment for each of the months sued for.

84. While there, Mr. Adams was made to wait and eventually told that the person who would need to be spoken to was out of the office that day, but would take a message and follow up. He left copies of his money order receipts with the office.

85. He never heard back from anyone and the case was not discontinued until June 24, 2025. Mr. Adams never heard from the Management Defendants about the subject of his visit after leaving their office.

86. In the Discontinuation, Defendants then allege "$5,219.64 is owed through May 31, 2025, comprised of $168.06 for February 2025 and $1,683.86 per month for March 2025 through May 2025. Exhibit L (Sixth Discontinuance)

87. Again, this discontinuation neglects to refer to the rent ledger attached to it, that clearly shows the full rent paid for February, March and May. February rent had been received and recorded on February 24, 2025, March rent had been received and recorded on March 17, 2025, and April rent had been received and recorded on April 28, 2025. Additionally, according to Mr. Adams's money order receipts, he had submitted two separate payments to total the full rent of May's rent on May 23, 2025. The ledger attached to the discontinuation, however, was

outdated with the date of filing, as the rent ledger is dated May 20, 2025, the Discontinuation was dated June 9, 2025 and it was filed June 24, 2025.

88. Thus, the sixth lawsuit is yet another occurrence of Defendant Panza working with outdated information and making false claims about Mr. Adams's rental payments.

**Seventh suit: LT-319434-25/BX**

89. Defendants filed their second suit of 2025—and their *seventh* overall suit against Mr. Adams in just five years—just months later, on June 17, mere days after discontinuing the Sixth Petition on June 9. Exhibit M (Seventh Petition).

90. Although the last Discontinuation from LT-310503-25/BX showed a rent ledger that showed March 2025 and April 2025 rents were indeed paid, Defendants ignored their own records and filed a Petition which alleged $3,535.78 owed, with $1,683.86 each owed for April 2025 and May 2025, and $168.06 for March 2025.

91. The Petition attached a Fourteen Day Notice dated May 22, 2025, which was allegedly sent by Landlord Defendants to Mr. Adams. The notice alleged Mr. Adams owed $5,219.64 and if he did not pay that amount or leave the premises within 14 days, they would file a non-payment petition and seek eviction. The letter stated the amount $5,219.64 in rent was calculated as $1,683.86 for each month from March 2025 to May 2025, and $168.06 for the month of February 2025. Again, according to Defendants' own records, February, March and April rent payments were recorded and received. Exhibit L (Sixth Lawsuit Discontinuation).

92. Mr. Adams, however, had already paid all of the amounts alleged in the Petition and the Rent Demand with payments earmarked for the months sued for.

93. Mr. Adams also had proof that he sent May's rental payments on May 23, 2025, with money order receipts.

94. Mr. Adams retained counsel from The Legal Aid Society on August 18, 2025, with counsel putting a Notice of Appearance in Bronx Housing court on the same day.

95. Counsel from The Legal Aid Society, Ms. Nicole Reed, appeared in court on August 21, 2025 on Mr. Adams's behalf with proof that the petition was satisfied. Moreover, based on a past rent breakdown and money order receipts, it was believed Mr. Adams was actually owed a rent credit.

96. In court, counsel for the Petitioner was not present, but instead a paralegal from the Gold & Rosenblatt, LLC firm. The paralegal presented Ms. Reed with an already signed discontinuation stipulation from Defendant Panza and requested her to sign it. Ms. Reed said that based on her calculations, she believed there was a mistake in the rent breakdown and would not sign the discontinuation unless the rent breakdown was corrected or a rent credit was issued. Because there was no counsel there on behalf of the Petitioner or Gold & Rosenblatt, LLC, the proceeding had to be adjourned.

97. Over email, Ms. Reed provided proof of Mr. Adams's rental payments to Defendant Panza, explaining the Petition had been satisfied prior to the proceeding being filed and Mr. Adams was entitled to a credit.

98. Defendant Panza responded, agreeing that client paid the months in the petition but claimed that there were other missed payments from 2022, 2023 and one month in 2025. None of these months were listed in the Petition.

99. Defendant Panza said she would sever the July 2022 payment due to laches, but not the others. However, she did admit the petition was nonetheless satisfied and wished to discontinue the proceeding but only without prejudice to the landlord's rights to seek those months in a separate proceeding.

100. In response, Ms. Reed further pointed out that the money order receipts and the rent breakdown do not correlate with Defendant Panza's claims, and nothing was owed, sending a spreadsheet of a corrected rent breakdown that would show Mr. Adams not only did not owe rent, but had overpaid rent.

101. Defendant Panza sent back a printed version of the excel with "adjustments," being handwritten notes that crossed out certain payments. Exhibit N (Petitioner's Rent Breakdown).

102. The next time both counsels appeared in court, Ms. Reed presented Defendant Panza with money order receipts for the months she had previously claimed were unpaid, along with a rent breakdown showing that other alleged unpaid amounts were, in fact, paid in subsequent months. Defendant Panza told Ms. Reed she would not base calculations off of the rent breakdown Ms. Reed created, only the one she provided. Defendant Panza said she would still sever anything owed before July 2022, but only if they discontinued that day. However, Defendant Panza wanted to include that "Petitioner alleges October 2025 rent is still due." With money order receipts for October 2025, Ms. Reed refused to allow that language in the stipulation. Defendant Panza agreed to not include that language and upon advice from a supervisor at The Legal Aid Society, the stipulation of discontinuation was signed without mention of the rent credit. Exhibit O (Seventh Discontinuance), Exhibit P (Combined Money Order Receipts).

**Eighth suit: LT-310012-26/BX**

103. Defendants filed their first suit of 2026—and their *eighth* overall suit against Mr. Adams in just five years—on March 19. Exhibit R (Eighth Petition).

104. Similar to the previous proceedings, Defendants sought rent for only the months immediately preceding the filing of the Petition. The Rent Demand alleged that Mr. Adams owed

$168.06 for November 2025 and $1,683.86 for each month from December 2025 through February 2026.

105. Mr. Adams had already paid the rent demanded for each of those months with payments earmarked for the months sued for.

106. Upon receiving the Rent Demand and Petition, Mr. Adams attempted to resolve the matter directly with Defendants and avoid further litigation.

107. Mr. Adams sent a letter to Defendants to inform them of the defective papers and attempt to avoid litigation. Exhibit S (Mr. Adams's letter to Defendants with proof of payments, filed in the Eighth suit). Mr. Adams sent the letters by certified mail to the Defendants.

108. In the letter Mr. Adams informed Defendants the rent demand and Petitioner were inaccurate since the alleged months had already been paid. He also provided Defendants with photographs of the money orders which showed his payments for the months alleged in the Rent Demand and Petition. Mr. Adams paid expenses for the delivery of the letter.

109. Mr. Adams never heard back from any of the Defendants.

110. On April 12, 2026, Mr. Adams retained The Legal Aid Society again for the second time. Ms. Nicole Reed was again assigned as counsel from The Legal Aid Society.

111. Ms. Reed filed a Notice of Appearance and Answer on April 12, 2026 on behalf of Mr. Adams. Exhibit T (Answer filed in the Eighth suit). The Answer noted that Mr. Adams "made payments during the period of alleged arrears, but these payments are not accounted for in the rent demand." Exhibit T, ¶13. The Answer detailed payments Mr. Adams made from November 2025-February 2026, and referred to money order receipt numbers for the payments. Exhibit T, ¶¶14, 22.

112. On May 15, 2026, Mr. Adams moved to dismiss the proceeding pursuant to CPLR

§§ 3211(a)(1) and 3211(a)(7), RPAPL §§ 741(4) and 731(4), and CPLR 409(b), on the ground that the Petition had already been satisfied. Mr. Adams also sought dismissal based upon the defective Rent Demand under RPAPL § 711(2), RPAPL § 741(4), and CPLR 409(b), because the Rent Demand did not set forth an approximate good faith sum of rent actually due. Exhibits U (Plaintiff's May 15, 2026 motion papers in Eighth suit).

113. The motion explained and documented that each of the alleged months in the Rent Demand and Petitioner had been paid prior to the start of the proceedings, rendering the Petition moot.

114. Specifically, Mr. Adams made the rent payments for November 2025-February 2026 in the month they became due, and exhibits were attached with money order receipts of the payments made in their due month. *See* Exhibit U, ¶¶ 20, 22.

115. The motion further argued that since the months had been paid each month rent became due, the rent demand was fatally defective.

116. Thus, as the rent demand failed to provide a good faith approximation of what was due, the predicate notice violated RPAPL § 711(2), which is an unamendable defect.

117. The ledger Defendant Panza provided confirmed that the rent payments for November 2025 through January 2026 had been received and recorded during the very months in which those payments became due.

118. On May 28, 2026, The Legal Aid Society and Defendant Panza appeared in court. Rather than discontinue the action given the documentary proof the that Mr. Adams in fact paid each month for which he was sued, Defendant Panza sought and obtained an adjournment based on the representation that she needed time to file an opposition, further dragging out an unlawful lawsuit. In fact, Defendant Panza never filed an opposition.

119. On July 30, 2026, Defendant Panza requested an adjournment which was not granted. Instead the Court issued an order granting Mr. Adams's motion and dismissed the proceeding without prejudice. Exhibit V (Judge Shahid's July 30, 2026 Decision/Order filed August 5, 2026). In his decision, Judge Shahid noted that Defendants had submitted no written opposition and that Defendant Panza had acknowledged on the record that the Petition had been satisfied. *Id*. ("Without written opposition and an acknowledgment from Petitioner's attorney on the record that the Petition has been satisfied, Respondent's motion is granted and the matter is hereby dismissed without prejudice on the ground that the Petition herein has been satisfied.") The Court dismissed the proceeding on that basis while leaving the parties' respective claims and defenses concerning any other alleged arrears unresolved.

**August 21, 2026 Pre-suit Rent Demand**

120. August 12, 2026, just seven days after the Decision/Order dismissing the eighth lawsuit was filed in the Housing Court, the Landlord Defendants sent a Notice to Tenant of Failure to Receive Rent Payment to Mr. Adams, alleging overdue rent for May 2026 at $168.06, June 2026 at $1,683.86, July 2026 at $1,683.86, and August 2026 at $1,683.86 for a total of $5,219.64. Exhibit W (August 12, 2026 Andrews 102 LLC Letter).

121. Then the Attorney Defendants followed with a letter dated August 20, 2026 claiming Mr. Adams owed $5,200.98 in rent arrears, not the $5,219.64 total sought in the August 12, 2026 letter, without any explanation of the discrepancy. Exhibit X (August 20, 2026 Gold & Rosenblatt P.C. Letter).

122. The Landlord Defendants (or perhaps Attorney Defendants on behalf of the Landlord Defendants) also sent a Rent Demand dated August 21, 2026. The Rent Demand alleged that Mr. Adams owed $1,606.76 for August 2022, $24.10 per month for September,

October, November, and December 2022, $77.10 for January 2023, $53.00 for March 2023, $1,683.86 for December 2023, and $1,683.86 for August 2026. Exhibit Y (August 21, 2026 Rent Demand).

123. Mr. Adams had already paid the rent demanded for each of those months listed in the August 21, 2026 Rent Demand. For example, the petition for the fourth lawsuit sought, among others, $1,683.86 rent allegedly due for December 2023. Exhibit G, ¶6. The notice of discontinuance of that lawsuit explicitly stated that Mr. Adams "satisfied" the petition. Exhibit H, ¶ 1. More importantly, Mr. Adams had already provided defendants with proof of payments for December 2023 as Exhibit P to his original complaint in this action, filed nearly three months before the August 21, 2026 alleging rent arrears. (Dkt. No. 1-16).

***Defendants' Illegal, Baseless Lawsuits Caused Mr. Adams to Incur Economic Damages and Emotional Distress***

124. Due to the constant lawsuits, Mr. Adams is persistently distraught. He no longer anticipates the possibility of future claims, but instead lives in a constant state of expectation, organizing his life around when the next lawsuit will occur.

125. Mr. Adams feels depressed and worried each time he receives a bill, rent demand, or eviction petition seeking rent he does not owe. He is worried about the prospect of eviction and homelessness—not just for himself, but more importantly for his three young daughters.

126. Despite his consistent compliance making timely rent payments, he believes these efforts are inadequate to protect his housing and fears he may still lose his family's home.

127. Mr. Adams is a dedicated father, and he is fearful of what could happen to his daughters. Mr. Adams has no idea what he and his family would do if evicted.

128. Mr. Adams tries to keep the stress of the constant, wrongful eviction threats from his daughters. However, the stress makes him irritable and angry, and his family notices, particularly

his fiancée.

129. Mr. Adams has trouble sleeping on a regular basis due to the constant fear of wrongful and meritless eviction hanging over his head. Mr. Adams gets up for work between 4 and 4:30 each morning, and takes great pride in his work as a chef; the loss of sleep affects his performance and temperament at work, and makes him tired on the job. Mr. Adams has had trouble sleeping on and off for over a years now, because that is how long Defendants' campaign of harassment has been ongoing.

130. Mr. Adams thinks constantly about Defendants' harassment. Mr. Adams feels "overwhelmed," as if he will "never catch a break." Mr. Adams feels harassed and targeted; further, he feels insulted by Defendants' continued refusal to correct their erroneous records and stop alleging Mr. Adams owes rent which he has already paid. Mr. Adams feels like his fate is out of his control, and as if he is at the mercy of Defendants.

131. Along with the constant worry, Mr. Adams is troubled by the thought that the incessant lawsuits are attempts to force him to vacate the apartment. Although he believes he has been an exemplary tenant for the last twenty years, the anxiety that has continued to build as a result of these cases has led him to believe the harassment is motivated to get him and his family to move.

132. Mr. Adams is very worried Defendants will pursue his family again. He feels trapped in this cycle, and he files this suit to free himself and his family from the constant threat of eviction over rent he has already paid.

133. Mr. Adams keeps stacks of money order receipts going back for years, close to a decade. Yet, Mr. Adams' livelihood is at the whim of Defendants' rent ledgers. He must rely on the payments Defendants themselves record as received, regardless of the accuracy of how the

arrears are calculated and/or how they appear in those records. He knows he has paid all his rent, but he is afraid that there will continue to be suit after suit, and if he does not have documentation for even one month of rent that Defendants falsely claims he owes that they will evict him and his three young daughters.

**Defendants' pattern and practice of filing multiple suits where rent was not owed at all, or was greatly inflated, often discontinued as "satisfied" if tenant appears**

134. Housing Court filings brought by Petitioner, Andrews 102 LLC, demonstrates a consistent pattern of initiating nonpayment proceedings where little or no rent owed, discontinuing those proceedings once an appearance or answer is made, and, in one instance, obtaining a default judgment for possession despite no monetary recovery.[6]

135. This pattern of unnecessary litigation burdens tenants and shows no good-faith effort to recover arrears. This documented pattern and practice evidence supports Plaintiff's claims of gross negligence, consumer oriented counsel, and misconduct sufficient to support a claim for violations of Judiciary Law 487.

136. Petitioner repeatedly files cases that are discontinued as the Petition is "satisfied," often shortly after the tenant appears. In *Andrews 102 LLC v. Belkis Hidalgo*, three proceedings (between 2023–2025) were all discontinued after an answer was filed and before any hearing. Similarly, in *Andrews 102 LLC v. Marilyn Aguirre*, two of three cases (between 2022–2025) were discontinued as satisfied, and the third was discontinued after the tenant complied with payments.

137. In *Andrews 102 LLC v. Irma Santana*, two cases (between 2022–2024) were discontinued as satisfied, even while Petitioner continued to allege additional sums owed,

---

[6] The full court files in these cases, through NYSCEF, the New York State Courts Electronic Filing system, are incorporated by reference.

including in a case where the court appointed a Guardian Ad Litem. In *Andrews 102 LLC v. Janet Bruno*, three cases (between 2022–2025) resulted in one discontinuance, one settlement focused on repairs without a clear finding of arrears, and one matter never litigated. In *Andrews 102 LLC v. Grace Zambrano,* five filings (between 2020–2025) included multiple discontinuances as satisfied and duplicative filings in the same year, with only one instance of apparent arrears.

138. Further, and most concerning, Petitioner has repeatedly obtained default judgments awarding $0.00 while still securing judgments of possession. In *Andrews 102 LLC v. Arcadia Castillo*, a 2020 case was discontinued because the tenant had a rent credit; then in 2025 they were sued again but after the tenant appeared to default (not appearing in court), Petitioner obtained a default judgment for $0.00 and possession. However, a notice of eviction was never filed. Similarly, in *Andrews 102 LLC v. Reyes Kelly*, Petitioner filed six cases (between 2020–2025), repeatedly discontinuing them as satisfied while alleging different months owed. In both 2024 and 2025, Petitioner obtained default judgments awarding no money but granting possession; the 2024 judgment was later vacated after Petitioner claimed the petition was satisfied. However, in the 2025 case, with similar facts, Petitioner ***still*** did pursue eviction and a Notice of Eviction ***was*** filed, even with no monetary judgment, which prompted the tenant to have to file an Order to Show Cause asserting all rent had been paid.

139. There is a clear pattern: Petitioner files serial nonpayment proceedings, discontinues them when challenged or unsupported, and leverages defaults to obtain possession even where no rent is awarded. The consistency of discontinuances as “satisfied,” along with zero-dollar judgments, indicates that many of these cases are commenced without legitimate arrears at the time of filing.

**<u>FIRST CLAIM</u>**
**Violations of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.***
**(Against Attorney Defendants)**

140. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

141. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

142. Congress designed the FDCPA to be enforced primarily through private parties, such as Plaintiff, acting as "private attorneys general." <u>See</u> S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance . . . ."); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

143. The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

144. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff

was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

145. For the reasons set forth in the "Parties" section of this Complaint, the Attorney Defendants are each a "debt collector" as defined in 15 U.S.C. § 1692a(6).

146. The Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

147. As a direct and proximate result of the Attorney Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, forgone wages because of missing work, postage to respond to pre-suit rent demand, and associated transportation costs, for travel back and forth to Bronx County Housing Court.

148. The injuries inflicted on Plaintiff by the Attorney Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

149. Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to foregone wages and costs of

transportation to court.

150. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, gross negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

**SECOND CLAIM**
**Violation of GBL § 349**
**(Against All Defendants)**

151. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

152. New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. L. § 349(h).

153. As enumerated above, Defendants violated N.Y. Gen. Bus. L. § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

154. Defendants committed the above-described acts willfully and/or knowingly.

155. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

156. As a direct and proximate result of those violations of N.Y. Gen. Bus. L. § 349 *et seq.*, Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, and statutory damages, together with costs and attorney's fees.

157. The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

158. That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability. Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

159. As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

160. The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

161. Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for printing and for postage.

162. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, gross negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

163. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## THIRD CLAIM
## Violation of New York Judiciary Law § 487
## (Against Attorney Defendants)

164. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

165. New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

166. Judiciary Law § 487 is a traditional cause of action in American courts - N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

167. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, gross negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

168. Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

**<u>FOURTH CLAIM</u>**
**Gross Negligence**
**(Against All Defendants)**

169. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

170. Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

171. Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

172. Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

173. Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

174. Defendants owed Mr. Adams a duty pursuant to the FDCPA, which is designed to protect consumers in part by prohibiting debt collectors from using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; using false, deceptive or misleading representations or means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

175. Creditors and debt collectors in general owe debtors a duty of reasonable care in collecting their debts. *Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), *aff'd* 529 F. Appx. 45 (2d Cir. 2013).

176. GBL § 349 also imposes on Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

177. Defendants breached these duties.

178. As a direct and proximate result of Defendants' breach of these duties, Mr. Adams suffered compensable harm, including actual damages and emotional distress.

179. Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Upon information and belief, Defendants have engaged in a pattern and practice of similar behavior against other tenants. As a result, Mr. Adams is entitled to actual and punitive damages.

180. To the degree that gross negligence claims are inconsistent with intentional misconduct, those allegations are made in the alternative.

181. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, gross negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

## DEMAND FOR JURY TRIAL

182. In accordance with Fed. R. Civ. P. 38(b), Mr. Adams demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

(a) Assume jurisdiction of this action;

(b) Declare that Attorney Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq*;

(c) Declare that Attorney Defendants violated New York Judiciary Law § 487;

(d) Declare that all Defendants violated New York General Business Law § 349 and committed gross negligence;

(e) Enjoin all Defendants from committing similar deceptive practices in the future;

(f) Award plaintiff actual damages against all Defendants;

(g) Award plaintiff statutory damages against Attorney Defendants pursuant to 15 U.S.C. § 1692k(a) and against all Defendants pursuant to GBL 349(h);

(h) Award plaintiff treble damages under NY Judiciary Law § 487 against Attorney Defendants; and treble damages up to $1,000 against all Defendants pursuant to GBL § 349;

(i) Award plaintiff exemplary and punitive damages against all Defendants for gross negligence;

(j) Award plaintiff costs and attorneys' fees against Attorney Defendants pursuant to the 15 U.S.C. § 1692k(a)(3); and against all Defendants pursuant to GBL § 349(h);

(k) Award plaintiff such other and further relief as may be just and proper.

Dated: September 12, 2026
Brooklyn, NY

*/s/ Ahmad Keshavarz*
__________________

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (347) 308-4859
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

*/s/ Nicole Reed*
__________________

The Legal Aid Society
Nicole Reed, *Of Counsel*
260 East 161st Street, 8th Floor

Bronx, NY 10451
Tel. (929) 745-2732
Email: nmreed@legal-aid.org